Index No.

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

---------------------

**KENNETH ROBINSON,**

Plaintiff,

v.

EX PARTE PART 72 / SUPREME COURT PART 66 (and New York City Civil Court Consumer Debt Parts 11C, 14, 15C, 30C, 32C, 34C, and 35C), GLADYS GUERRERO-AQUINO (individually and in her official capacity as Deputy Chief Clerk), MR. ANIBAL FLORES (individually and in his official capacity as Court Clerk), HON. JUSTICE RICHARD VELASQUEZ (individually and in his judicial/administrative capacity), CITIZENS BANK, N.A., PORTFOLIO RECOVERY ASSOCIATES, LLC, and RUBIN & ROTHMAN, LLC,

Defendants.

------------------------------------------------------------X

Civil Action No.: 1:26-cv-05480

**COMPLAINT AND DEMAND FOR JURY TRIAL**

VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ADA (42 U.S.C. § 12101 et seq.), 42 U.S.C. § 1983 (DEPRIVATION OF RIGHTS UNDER COLOR OF STATE LAW), AND OATH-BASED COMPLICITY UNDER 18 U.S.C. §§ 3 AND 4

ORIGINAL

REC'D IN PRO SE OFFICE
SEP 24 '26 PM 12:30

**Index No.**

## I. PRELIMINARY STATEMENT & THE ARCHITECTURE OF THE ACTION

The Core Declaration

Plaintiff Kenneth Robinson brings this civil rights and statutory enforcement action to dismantle a corrupt, systemic administrative syndicate operating within the New York State Unified Court System—specifically targeting Ex Parte Part 72, Supreme Court Part 66, the associated Civil Court Consumer Debt Parts (including underlying proceedings under Index Nos. **410-2026** and **CV-100332-26/KI**), their administrative gatekeepers, and predatory corporate proxy networks. This federal action serves as a market-cleansing disinfectant, designed to pierce false legal masks, dismantle unauthorized shadow dockets, and establish absolute judicial accountability where local administrative oversight has collapsed into institutional self-preservation and complicity with predatory financial institutions.

### The True Meaning of "Standing"

In the lexicon of this action, "standing" is restored to its foundational moral and sovereign definition: the absolute right to stand up and be heard, free from coercive intimidation, proxy-based fraud, institutional illusions, and the compelled, unbargained-for waiver of rights via click-through login portals that substitute code for court accountability, even as they substitute proxy facade entities for real parties in interest pulling the strings from the shadows. Authentic standing also has the standing to verify or even be informed who the opposing party actually even represents. What is their standing? While volume debt-collectors, corporate assignees, and their representatives (such as Rubin & Rothman, LLC and Portfolio Recovery Associates, LLC) utilize an endless shell game of concealed real parties in interest, swapping standing, risk assets,

representation and false representations of every sort with the court refusing to verify them and even actively concealing core instruments the courts created and/or co-executed on their behalf. Then when these courts are exposed, they conceal, obstruct and retaliate or turn a blind eye to escalating retaliation by others when the litigant attempts to seek a record or to put anything on the record. This serves in part to crush particular unrepresented litigants of course but most importantly it serves as a warning to others, to avoid setting a precedent. They will individually and collectively go to any lengths ensure unrepresented litigants suffering this abuse of process have now way out. They will continue to trap and abandon vulnerable citizens in a rigged hall of mirrors down into a subterranean labyrinthine void.

**The Subterranean Labyrinth**

High legal competency and strategic awareness act as sensors for structural corruption, rather than disqualifiers for equitable protection. Having in the past navigated over a decade of high-level Operation and Information Systems and Technology management at a major New York law firm, Plaintiff approaches this litigation not as a confused outsider, but operating with refined—often all too sensitive—instinct alongside certain immunity to institutional smoke and mirrors. Marked by a disciplined, rigorous "on-the-papers" methodology of comprehensive paper trails, recordings, and structured filings, Plaintiff treats the architecture of this complaint as a way out of those subterranean labyrinths where predatory financial institutions shield their joint-enterprise schemes—even behind the very court system we rely on to protect and uphold those same constitutional rights the predators devour. Plaintiff rightly recognizes that the ability to ensure his medical health via accommodations is interlocked with his right to properly access due process. For example, as a pro se litigant he must navigate the powers and parameters of no less that three courts (State Civil, state Supreme and Federal and yet parse each to appropriate partition, compartmentalize, apportion tortious vectors exacerbated and spawned in each

forum) . Precise language in written filings is a must. The argument that this may clog the courts is precisely the reverse of reality all sides observe. As citizens are freed of this unjust burden so too may the courts be free of it before they are further clogged and corrupted by it. Like a blind man who may be asked to join a rescue team to lead families out of this darkness, here the "disability" may be an asset in a subterranean labyrinth if properly handled including by authorities. As I watched a impoverished veteran railroaded in court by an attorney who offhandedly said he represented Rubin and Rothman rather than Bank of America who the docket posted on the door claimed was the Plaintiff — of course the veteran thought he was actually facing Bank of America — not understanding the chasm between these evasive representations when standing is hopelessly deficient. Then minutes later the same per diem attorney Mr. Kingston was representing PRA. This took place at a ghost hearing arranged in my name either by my opposing counsel or by someone else — on June 10 — wherein Clerk Flores silenced me from correcting the record that my own opposing counsel is <u>not</u> representing me and that I still do not know how or for what purpose this ghost hearing was arranged behind my back. A week earlier on September 3, Judge Mark Kagan shielded per diem opposing counsel Jonathan Kingston, Esq. — as Mr. Kingston concealed who if anyone he represented in my case. Judge Kagan, who arrived totally unbriefed, repeatedly declared both off and on the record that it was "irrelevant" who Mr. Kingston represented. No Notice of Appearance, no statement, just a naked call by Mr. Kingston to adjourn which I objected to and which was then logged by Mr. Flores as consensual. On June 10, at the ghost hearing, I watched the impoverished veteran with the court attorney who refused to pass any information to the bench about my ADA protocols, and as usual informed me I was represented by my opposing counsel, like the posting on the door "evidences". Together we watched that veteran, and I began to imagine a veteran who suffers anxiety attacks when he picks up — often before anyone else can — on the most imperceptible clues of criminal threat others miss, and tries to control his anxiety as it mounts in

response to these threatening clues. Acumen or intelligence do not mitigate the nervous system's instinctive physical response to danger and threat. To the contrary acumen may well exacerbate it if these early warning alerts cannot quite be pieced together yet amid the gaslighting and obstruction. This is far worse than mere “unaccomodation”, it is the inevitable result of that which begins as gaslighting, then omission, evasion, obstruction, stonewalling, concealment, and then escalating retaliation, even from those we entrust our Constitutional protections and our fate to. Einstein often posed thought experiments as his first step, and in our own thought experiment: Imagine Einstein enjoys weekly dinner at a friend’s house, but the odd inclusions and omissions in conversation, soon trigger panic attacks and sleepless nights increasingly for Einstein. All others at the table miss these clues entirely. But it is not in spite of but because of his acumen that he is triggered increasingly by worsening, mounting anxiety attacks by real subtle threats others are missing: his friend is a traitor providing bomb secrets to the enemy. Einstein’s mounting anxiety and panic attacks along the way infect his home, work, and even his increasingly dangerous visits to his friend’s dinners, as traps by his friend and his accomplices are increasingly readied to spring on their timetable.

**From Indifference to Active Weaponization & Oath-Based Liability**

Unlike standard claims resting on passive "deliberate indifference," the Defendants here crossed a constitutional Rubicon. Operating under the cover of confidential ex parte ADA accommodation channels, state judicial administrators and presiding jurists did not merely ignore Plaintiff's documented medical vulnerabilities—they actively weaponized them. By deliberately dumping confidential medical disclosures onto public dockets, triggering adversarial auto-alerts, and staging physical intimidations, the syndicate transformed statutory privacy shields into tactical offensive weapons. Furthermore, this active concealment directly triggers criminal complicity and misprision liability under 18

U.S.C. §§ 3 and 4, converting administrative obstruction into actionable federal statutory violations.

## II. JURISDICTION AND VENUE

- Federal Question Jurisdiction: This civil action arises under the Constitution and laws of the United States, specifically including Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. (anchored by the constitutional abrogation principles of Tennessee v. Lane, 541 U.S. 509), the Civil Rights Act of 1871, 42 U.S.C. § 1983, securing redress for deprivations of due process and equal protection under color of state law (Morgan v. United States mandate), and federal enforcement frameworks under 18 U.S.C. §§ 3 and 4. Supplemental jurisdiction over related state-law tort and statutory claims is invoked pursuant to 28 U.S.C. § 1367.

- Venue: Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), as all events, omissions, and constitutional deprivations giving rise to these claims occurred within Kings County, New York, residing squarely within this judicial district.

## III. PARTIES

- Plaintiff Kenneth Robinson is an unrepresented pro se litigant residing in Brooklyn, New York, who maintains an unyielding "on-the-papers"—operationally and technically forensic—posture to secure his civil rights and protect his documented medical accommodations.

- Defendants Ex Parte Part 72 and Supreme Court Part 66 (along with the associated New York City Civil Court Consumer Debt Parts 11C, 14, 15C, 30C, 32C, 34C, and 35C) are the specific administrative and judicial parts of the New York State Unified Court System utilized as hubs for shadow-docket processing, unaccommodated default mechanisms, proxy-shifting, concealment, abdication and violations of oaths of office, and privacy breaches across both the Supreme and Civil Court levels in Kings County.

- Defendant Gladys Guerrero-Aquino is sued individually and in her official capacity as Deputy Chief Clerk of the Kings County Civil Court, responsible for administrative routing, supervisory oversight, blocking ADA accommodations from Plaintiff, concealing eight core court-held instruments from Plaintiff (including documents apparently signed and authorized by the court on August 24, but still hidden), and deliberately weaponizing Plaintiff's medical condition to intimidate him by calling a bailiff to loom over him while demanding he replace a verified paper trail—including his surgical eight-point forensic audit list—with a single sheet of blank paper to be written on "now".

- Defendant Mr. Anibal Flores is sued individually and in his official capacity as a Court Clerk within the Kings County judicial apparatus, responsible for executing shadow-docket protocols, suppressing objections, manipulating physical mailing procedures, logging appearances as "adjourned on consent" to exhaust statutory limits on a timeline fitting the concealed sworn affirmations that privately evidence who they actually represent.

- Defendant Hon. Justice Richard Velasquez is sued individually and in his judicial/ administrative capacity as a presiding Justice of the Supreme Court, Kings County (presiding over parts including Part 66), architect of circular procedural denials, orchestrator of engineered scheduling collisions (including the August 5 hearing

and the complete lack of record-keeping surrounding it), executor of the September 9, 2026 meta-shell game, and authorizer of the public publication of private medical information, including confidential ADA-related documentation. Defendant Velasquez also actively concealed instruments such as the "Pointdujour Mandate"—a handwritten proposed judicial order submitted on August 5 prepared by opposing counsel Rachelle Pointdujour, Esq., who (while claiming to only exclusively represent PRA) argued vigorously for it. Although certain corporate defendants had not formally appeared prior to that date, this document and her arguments exposed the underlying Joint Enterprise and Master Servicing Agreements (MSAs) / Forward-Flow Agreements (FFAs). Despite immediate alerts, this vital document remains missing from the public plenary file and concealed from Plaintiff, again despite alerts at the highest level of the state court system. And likewise no recording was kept after all of the hearing, and the official record shows the case as "never even called".

- Defendant Citizens Bank, N.A. is a national banking association—with questionable legal existence, noting Department of State portal listings indicating it was "merged out of existence" in 2007—and operates as the primary nominal Plaintiff in underlying state debt-collection proceedings in joint enterprise with institutional debt buyers and collection counsel.

- Defendant Portfolio Recovery Associates, LLC (PRA) is a foreign limited liability company and forward-flow assignee operating as a primary real party in interest behind a facade of nominal bank representation.

- Defendant Rubin & Rothman, LLC is a New York law firm acting as collection counsel, orchestrating proxy-based litigation, insider docket manipulation, process service and mail fraud, and malicious procedural railroading designed to force proceedings on one of two main operational tracks — regardless of where and

how the Constitution would direct proper proceedings — all toward a pre-determined "Escape Hatch A and B" strike point. This is largely why the syndicate reacts with such transparent thuggish and increasingly transparent and soon dangerous heavy-handedness. It demonstrates a mechanical, automated desperation to stay on rails by any means even as it becomes a runaway freight train. It is the escalating desperation of the entire syndicate to stay on those rails and ensure no precedent is set that may uproot the tracks of the gravy train for hundreds of thousands of parallel litigations they launched with the very same algorithmic-operational playbook of dirty tricks. But now the retaliation has escalated to a point that Plaintiff and his family are being put at mounting risk, threat and harm.

## IV. FACTUAL BACKGROUND: THE SYNDICATE'S PLAYBOOK & STRUCTURAL CORRUPTION

### A. The Portal Trap and the "Escape Hatches" (MSA/FFA Architecture)

From the inception of the state collection actions, Defendant Rubin & Rothman embedded striking all-caps warnings across initial process filings, aggressively demanding that any retained counsel MUST execute filings exclusively through NYSCEF portals under strict procedural and operational mandates. Plaintiff's refined institutional insight—honed through extensive Operations and Information. Systems management experience at a major NY lawfirm—instantly recognized this aggressive "ALL BOLD" command not as a measure of an adversary like Rubin and Rothman trying to help their targeted victim improve administrative efficiency, but rather as more likely an architectural necessity for the syndicate's Master Servicing Agreements (MSAs) and Forward-Flow Agreements (FFAs) to herd, coral and funnel their targets into their two most tightly controlled chutes.

These agreements rely on hardline dual-track procedural and operational "Escape Hatches" that, to be effective and to remain invulnerable to disruption or even delay, must enforce strict adherence and obedience of not only each entity and their counsel, but adherence by the courts themselves, to keep everyone on these allotted tracks to the end of the line no matter what the overflow, or the damage.

- Procedural Track to Escape Hatch A: Used to conceal, divert, or swiftly drop non-NYSCEF or unrepresented litigants into administrative blind spots via non-public shadow dockets, unbriefed and unrecorded proceedings, procedural "squeeze plays," logging false "consensual" adjournments to exhaust statutory limits, and arranging "ghost hearings" where pro se litigants are entirely excluded, and even if they do unearth these proceedings, their objections are suppressed while opposing counsel coordinate behind closed doors. All this and more is to ensure any counter strike conceived by unrepresented defendants is either premature — or too late, while this same syndicate ensures a free hand to swap risk and ownership in various shell companies that carve up ownership, commission and continued management of whatever they can squeeze as they process as many as they can coral and electro-prod through their two chutes. Once on their allotted chutes, the syndicate must increase the speed of the runaway train alongside court accomplices, to meet rigid timetables of liability risk swaps, shedding/acquiring standing, concealing chain of title or the hopeless lack thereof, and burying tortious insurance disclosures they may have exposed themselves to a mandate to reveal. For example, observe the drop dead date Ms. Pointdujour demanded for her over reach, which was in fact the same drop dead date later executed — August 24 — whether I had taking the bait of her transparent overreach on August 5 or not. She *had* to over reach on August 5, even as it so obviously unmasked — as I noted at the time into the "record" of Judge Velasquez's unrecorded "recording" — her and her client's current and previous perjurious denials, to

make August 24 appear it may be caused by my escalation — thus demanding retaliation —but rather it was in fact mandated by its own rigid adherence to a threshold timetable under a governing joint FFA of the joint enterprise syndicate.

- Procedural Track to Escape Hatch B: Used to execute quicker-strike proxy maneuvers, complex mutually indemnified risk swaps, and bail-out instruments on shorter timelines. This cut-and-run tactic involves heavily redacted cross-subpoenas, again utilizing the court as an accessory to joint mandates from their joint partners. But always on either track foundational financial instruments are concealed under the guise of "proprietary trade secrets" free from the prying eyes of the public, regulators or legislatures, and set on a procedural timetable that forces anyone caught on their chute — their crammed gauntlets — to adhere to a timetable where it is either to early or too late to assert let alone seek protection and enforcement of Constitutional rights.

By refusing to be pushed into and blindly surrender to electronic portal gauntlet—which abdicates court accountability for timely notice, proper procedural sequencing, including verification of threshold hurdles such as standing and tortious liability clarity—Plaintiff maintained strict control and reserved all rights to operate nimbly and one his own authentic standing, accountability and individual initiative — against adversaries who had none of these. Plaintiff operated in the spaces carved out between analog vs. digital "authorized login user" vs. public digital guest vs. analog records held at the court clerk's offices on unreliable scan-up lag, clerk hard file discretion, linking or delinking, a tidbit viewable here, not there, but also there but not here, not yet anyway, not until the mandated strike point that suits the syndicate so that it is always premature or too late for a defendant. These tight spaces between an authorized portal user vs. an authorized Constitutional rights holder, must end in our courts, a litigant should never be compelled to waive their rights to a click. But this maze of tight spaces exposes the chasm between

all these roles, authentic vs. inauthentic — and in turn between these tight turns one could view the canyons — the mammoth abyss and systemic scope of market and judicial corruption.

**B. The Medical Foundation and the Weaponization of Privacy**

Established formally in April 2026 across both lower Civil Court and upper Supreme Court forums, Plaintiff's ADA Reasonable Accommodation Request—supported by comprehensive medical documentation from Dr. Jeffrey P. Friedman, MD—established that Plaintiff suffers from a severe anxiety disorder directly triggered by high-stakes, unaccommodated impromptu oral demands and real-time verbal traps especially in a venue he senses are now operating in an adversary posture even as they ask to be—and should be trusted, indeed relied upon to upload their Oath. Because statutory ADA accommodation mechanisms are inherently ex parte by design to protect sensitive health data, Plaintiff submitted comprehensive medical records through designated confidential channels.

Rather than honoring their non-discretionary duty to route and protect these files, Defendants Velasquez and associated court officers and administrators weaponized this private data. In the lower court, likewise concealing and continuing to conceal core court documents, when inquiry as made by Plaintiff as ti its whereabouts , thrusted blank papers into Plaintiff's face in courtrooms while bailiffs loomed directly behind to intimidate Plaintiff, and by posting confidential medical disclosures onto the public-facing court docket to alert adversaries, Defendants twisted medical privacy into a weapon of retaliation.

### C. The September 9–10 Ghost Hearings and the Meta-Shell Game

On June 10, Judge Velasquez set a July 15 date for PRA to file an opposition to my motions, PRA defaulted on that deadline as they had on all others in the lower court including a court ordered subpoena. Though I presented a 3x3 foot chart as Exhibit A and read it into the record with the explicit confirmation from him it was in the record, both this appearance would later be recorded as never even called, and no recordings were made. Though two of the defendants (Citizens Bank, N.A. and Rubin and Rothman, N.A.) never even appeared let alone responded in the case, Judge Velasquez then on August 5 through a two-minute ambush just before announcing lunchtime and instructing the bailiff to clear the courtroom, issued a wildly unaccommodated, procedurally flawed denial designed to trap Plaintiff. When Plaintiff immediately moved to rectify and enforce accommodations, Justice Velasquez executed a breathtaking "meta-shell game" on September 9, 2026: instead of conducting a lawful inquiry into the severe ADA violations underpinning the August 5 order, Velasquez declared that the ADA was "moot" because he himself had already denied a motion sequence built atop simply ignoring the ADA protocols after a three minute unrecorded ambush on August 5.

On September 10, 2026, in the lower court a ghost hearing was orchestrated before Judge Kennedy, with Clerk Flores executing his familiar role: suppressing Plaintiff's formal objections, recording false appearances, and ignoring unaddressed ADA protections while physical courtroom doors falsely indicated active representation by outside counsel (Troutman Pepper).

### D. The April 2026 Processing Trap, ER Medical Emergency, and the Withheld OSC

The systemic obstruction was front-loaded into the inception of upper court proceedings in April 2026. Plaintiff's original Order to Show Cause (OSC)—which sought and secured an initial stay of lower court proceedings signed by Justice Gottlieb on April 26,

2026—was burdened with an impossible, engineered service deadline of May 1, 2026, and a return date of May 13, 2026. Despite Plaintiff appearing at the Ex Parte Supreme Court office daily and calling continuously, court personnel falsely reported that the document had not yet been signed. The signed OSC was intentionally suppressed and withheld from the public portal during this critical window, only to be instantly scanned and publicized after the May 13 return deadline to manufacture a default.

Even amidst severe medical distress requiring emergency hospital treatment on April 27, 2026—fully supported by official medical documentation—Plaintiff maintained diligent oversight, continuing phone inquiries and waiting in-person at ex parte offices for nearly two weeks off and on through April and May. This operational chaos was compounded in the lower court default judgments that needed to be vacated because the presiding judge apparently never reviewed the notices and pleadings. Per-diem opposing attorneys appeared without clear authorization, while notices of appearance were scanned at irregular schedules and mandated mail notifications were withheld.

**E. The Crossed-Out Stay, the August 5 Collision Trap, and Manufactured Lower-Court Defaults**

Following the initial default, Plaintiff submitted a second Order to Show Cause to vacate and restore, which Justice Velasquez signed on May 18, 2026, setting a May 27 service deadline and a June 10 return date. Crucially, Justice Velazquez affirmatively crossed out the provision staying the lower court proceedings. When the matter returned on June 10, Justice Velazquez scheduled August 5, 2026, as the return date, aggressively refusing to adjust despite Plaintiff's immediate verbal objections regarding simultaneous appearance conflicts in the lower consumer debt parts. This deliberate refusal to grant a stay, paired with an engineered scheduling collision—where Plaintiff arrived with a 3x3 foot exhibit chart and read a statement confirmed for the record, again only to discover no appearances were recorded or were logged as "never called"—was structured to trigger

defaults in the lower court while all forums abdicated accountability, with Judge Velasquez even pointing back to his earlier self.

**F. Ex Parte Clerical Evasion, and the Necessity of In-Person Intervention**

The administrative operation of the Ex Parte Supreme Court office is systematically compromised by unmonitored physical document custody and strategic gatekeeping. For weeks leading up to April 26, 2026, telephone inquiries regarding pending judicial orders were met with evasive stonewalling, long unexplained pauses, and conflicting accounts. Court staff routinely deflected accountability by demanding that litigants register as online portal users, forcing unrepresented parties into digital environments where proprietary "Escape Hatches" can be weaponized against them.

In the lower court, as demonstrated on September 10, 2026, critical judicial orders materialized and were handed over only because Plaintiff bypassed telephone, portal barriers, and explicit misinformation from Judge Kagan and Clerk Mr. Flores to appear in person—revealing Clerk Flores again appearing to manipulate administrative process as he silenced Plaintiff's objections, court attorneys denied relaying critical necessary information to the bench, and opposing counsel was listed in the docket as representing Plaintiff for weeks on end and perhaps still to this very day.

**G. The Physical Anatomy of Clerk-Proxy Collusion and 1990s Shadow Terminals**

The operational execution of the syndicate relies on specific physical and digital vulnerabilities embedded across court facilities (especially at 141 Livingston Street):

- Proxy-Shifting and Clerk Proximity: Per-diem shape-shifting attorneys (such as Jonathan Kingston, Esq., whose office is located directly across the street from the courts) routinely occupy desks positioned merely two feet from the duty clerk,

shielded by structural obstructions to facilitate unrecorded coordination during morning sessions immediately before lunch.

- The Post-Session Scan Gap: Crucial administrative windows—particularly between 3:30 PM and 4:00 PM—are systematically exploited to intake mysterious appearance postcards and shadow subpoenas while Plaintiff's routine filings remain de-linked, erased, and dockets manipulated.

- The 1990s Box-Monitor Shadow Track: The entire shadow docket at 141 Livingston relies on archaic, glitchy computer terminals equipped with box monitors (where frequently only one barely functions), herding pro se litigants into operational guide rails that obscure accountability through technical lag times, clerical manipulations, concealments, and obstruction.

**H. The September 18–21 Escalation: Surveillance, Postal Anomalies, and Electronic Interference**

As Plaintiff's forensic disclosures and preservation efforts closed in on the underlying mechanisms of the joint enterprise, the retaliation crossed from procedural obstruction into overt physical surveillance and mail irregularities.

- Synchronized Surveillance: On September 18, 2026, at 12:34 PM, Plaintiff filed a formal emergency stay pending disclosure. Exactly seven minutes later (at 12:41 PM), automated residential camera logs recorded the sudden arrival of a modified, extended-length, heavily tinted black SUV (New York Registration: LVT-8444) parking directly outside Plaintiff's residence boundary at 471 10th Street, maintaining a stationary, proximate, direct line of sight without a vehicle occupant ingress or egress across many consecutive days.

- Postal Metration Discrepancies: On September 21, 2026, three physical mail items arrived simultaneously under suspicious chronological and structural anomalies. Two heavy yellow envelopes from Rubin & Rothman (bearing IMI meter stamps dated September 15, 2026) arrived without official USPS cancellation postmarks. Simultaneously, an anonymous white envelope from Valley Stream, NY, bearing a Pitney Bowes meter date of September 10, 2026, featured a USPS spray-cancel from NJ dated September 19, 2026—exhibiting unexplained transit lag and mail routing irregularities concurrent with active federal filings.

- Electronic Security Disruption: Concurrently on September 21, residential security systems logged targeted interference: at 1:07 PM, an individual passed the property line while aiming a handheld device directly into the Ring camera lens, immediately followed at 1:28 PM and 1:49 PM by automated "Person" triggers that initiated complete video and audio feed blackouts precisely during delivery and service windows—pointing to localized wireless signal suppression.

## V. CLAIMS FOR RELIEF

COUNT I: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12101 et seq.)

(Against All State Defendants)

1. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

2. Plaintiff is a qualified individual with a disability within the meaning of Title II of the ADA, possessing documented cognitive-processing barriers triggered by unaccommodated oral proceedings and high-stress environments.

3. State Defendants—including Ex Parte Part 72, Supreme Court Part 66, the Consumer Debt Parts, Guerrero-Aquino, Flores, and Velasquez—excluded Plaintiff from participation in, and denied him the benefits of, the services, programs, and activities of the New York courts, actively retaliating against him by weaponizing confidential medical data and enforcing shadow-docket denials.

4. As a direct and proximate result of Defendants' statutory violations, Plaintiff has suffered severe constitutional injury, emotional distress, and financial damage.

**COUNT II: DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW (42 U.S.C. § 1983)**

(Against All Defendants) 5. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. 6. Defendants, acting under color of state law and in active joint enterprise with private corporate entities (Citizens Bank, PRA, and Rubin & Rothman), subjected Plaintiff to the deprivation of rights, privileges, and immunities secured by the Due Process Clause of the Fourteenth Amendment. 7. Defendants conspired to utilize sham proceedings, false mask representations, proxy-swapping, mail fraud maneuvers, coordinated physical surveillance intimidation, and the intentional public exposure of medical records to punish Plaintiff for exercising his right to a clean, public record and uncompromised due process. 8. The actions of the individual state defendants and private co-conspirators were undertaken with malice, deliberate intent, and reckless indifference to Plaintiff's federally protected civil rights.

**COUNT III: OATH-BASED COMPLICITY AND MISPRISION (18 U.S.C. §§ 3 AND 4)**

(Against Individual State Defendants Guerrero-Aquino, Flores, and Velasquez) 9. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

10. Individual state defendants, bound by constitutional and statutory oaths of office, actively concealed, facilitated, and partook in federal civil rights violations and fraudulent judicial schemes, while omitting to report known administrative felonies and systemic obstruction. 11. Such active complicity directly breaches mandatory oath-based duties, compounding liability under federal oversight statutes.

## VI. PRAYER FOR RELIEF AND SYSTEMIC STRUCTURAL REFORMS

WHEREFORE, Plaintiff Kenneth Robinson respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, providing the following relief:

A. Declaratory Judgment declaring that Defendants' actions, policies, shadow dockets, crossed-out stays, and weaponized disclosure of confidential medical information violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 1983, and federal oath frameworks;

B. Preliminary and Permanent Injunctive Relief enjoining Defendants from enforcing unaccommodated default mechanisms, fraudulently manipulating dockets, and utilizing retaliatory procedural gatekeeping;

C. Specific Injunctive Relief for ADA Compliance and Safety: Directing state court defendants to fully honor, implement, and maintain all approved Title II ADA reasonable accommodations without retaliation, barring the weaponization, public docket-dumping, or disclosure of confidential medical records, and enjoining Defendants, their agents, and associated proxies from engaging in coordinated physical surveillance, intimidation, or

interference near Plaintiff's residence, ensuring total preservation of personal safety and uncompromised civil rights;

D. Compensatory and Punitive Damages in an amount to be determined at trial, reflecting the severe systemic, psychological, and privacy injuries inflicted upon Plaintiff;

E. Market-Cleansing Disinfectant Oversight appointing specialized federal oversight or monitoring to audit the administrative practices of Ex Parte Part 72, Part 66, and the Consumer Debt Parts to ensure future compliance with state and federal disability mandates;

F. Systemic Injunctions and Structural Court Reforms, mandating the implementation of core administrative remedies to eradicate systemic corruption:

1. Mandatory Notice of Appearance in Hand: Requiring all counsel (including per-diem proxies like Kingston) to physically hand over a verified, sworn Notice of Appearance on the record the moment a case is called, eliminating ghost representations, deterring predatory actors posing as representatives for whatever Plaintiff is listed on the door, and thus clearing out much of the overcrowded courtroom from predators and their prey.

2. Clerk Rotation and Proximity Isolation: Enforcing strict rotation schedules for court clerks and eliminating unmonitored physical proximity between collection attorneys and court intake desks.

3. Infrastructure Modernization: Upgrading archaic shadow-track computer systems across Adams Street and 141 Livingston Street, replacing glitchy 1990s terminals, and harmonizing sunlight and shadow dockets under strict transparency rules that close the shadow zone separating anonymous vs. "verified" viewable login screens. As it stands the public portal favors the syndicate's choice of what information to display even as the login portal favors the syndicate's explicit phased timeline to deploy their scheduled payload filings at moments where

defendant's preemptive filings are too early and response and counter strike is too late or now irrelevant.

4. Multi-Channel Digital Alerts: Replacing easily manipulated physical snail-mail "postcards" with mandatory, automated email and SMS text alerts tied to simple in-person ID intake registration for all seismic docket events, attorney appearances, and subpoenas, eliminating the forced portal trap if one wants to access information they should have a right to without clicking away their rights to a portal's algorithm or those that know how to manipulate and game it; and

G. Reasonable Costs, Statutory Fees, and such other and further relief as this Court deems just, proper, and necessary to secure systemic accountability.

**Dated:** September 24, 2026
**Brooklyn, New York**

Respectfully submitted

**Kenneth Robinson, Pro Se**
Plaintiff and Counterclaim-Plaintiff
471 10th Street
Brooklyn, NY 11215
Phone: (917) 453-3631